**ANDREW CALAMARI**
**Acting Regional Director**
**Attorney for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center – Suite 400**
**New York, New York 10281**
**(212) 336-0589 (Howard A. Fischer, Senior Trial Counsel)**
**Email:  Fischerh@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
                                                               :

**SECURITIES AND EXCHANGE COMMISSION,**     :

                                         :     **11 Civ. 4723 (JFB)(GRB)**

         **Plaintiff,**                :

                                         :     **FIRST AMENDED**
                                         :     <u>**COMPLAINT**</u>

       **- against -**              :

                                         :     **ECF Case**

**THE NIR GROUP, LLC; COREY RIBOTSKY;**     :
**and DARYL DWORKIN,**                    :     **Jury Trial Demand**
                  **Defendants.**      :

                                         :
-----------------------------------------------------------------------x

       Plaintiff Securities and Exchange Commission ("Commission"), for its first amended

complaint against defendants The NIR Group, LLC ("NIR"), Corey Ribotsky ("Ribotsky")

(collectively, "Defendants"),  and Daryl Dworkin ("Dworkin"), alleges:

<u>**SUMMARY**</u>

       1.     This action involves the misconduct of an unregistered investment adviser that (i)

misappropriated over $1 million of client assets and (ii) made materially false and misleading

statements to investors, and omitted materials facts, in an attempt to conceal the poor

performance of his investment and trading strategy.  From at least 2004 to 2009, Ribotsky,

operating through his Long Island, New York unregistered investment advisory firm, NIR,

defrauded investors in the over $800 million AJW family of hedge funds (the "AJW Funds"),

which invest in PIPE transactions (private investment in public equity).

2.      From July 2004 to June 2009, Ribotsky misappropriated for his personal use over

$1 million of assets from one of the AJW Funds he was managing through NIR – the AJW

Qualified Partners, LLC Fund ("AJW Qualified Fund").  Ribotsky liquidated some of AJW

Qualified Fund's assets and misused the proceeds by writing checks to pay for personal services

and to purchase luxury items, including cars and expensive jewelry.  Ribotsky also wrote checks

to himself or to "cash" and then instructed NIR office employees to cash the checks at a nearby

bank and give Ribotsky the money.  Although Ribotsky was warned by NIR's head accountant

that he could not lawfully take this money for himself, Ribotsky continued to do so.

3.      In addition to misappropriating client assets, Ribotsky made false and misleading

statements to investors in 2007, 2008 and 2009 about the AJW Funds' performance and liquidity.

Among others, Ribotsky falsely told investors that, despite the adverse market conditions of that

time, NIR could liquidate – that is, fully convert to cash – all of the AJW Funds' PIPE

investments in 36 to 48 months.  This, however, was a practical impossibility under the

investment and trading strategy that NIR touted, given the size of the AJW Funds' PIPE

investments in microcap and nanocap companies and the adverse market conditions at the time.

4.      Ribotsky made these false and misleading statements even after the AJW Funds'

outside auditor met with him to discuss the results of their audit procedures, in which the auditor

calculated that it would take decades, if ever, to liquidate all of the AJW Funds' PIPE

investments under NIR's stated investment and trading strategy.  This was due, in part, to the

fact that by January 2008, NIR had acquired, in many instances, the contractual right to billions

of shares of stock in non-performing, distressed companies that were quoted at mere fractions of

a penny mostly on the Pink Sheets (now OTC Link), a private electronic inter-dealer quotation and trading system used in the over-the-counter market.  These issuers had very little, if any, trading volume in relation to the billions of shares that the AJW Funds were contractually entitled to receive.

5.      Furthermore, in November and December 2008, Ribotsky purported to sell $43.2 million of the AJW Funds' assets to a third-party (the "Purchaser") in an apparent effort to show investors that NIR was continuing to generate cash (or realized gains) in the fourth quarter of 2008.  The Purchaser, however, did not pay cash for the AJW Funds' assets; rather, he signed "promissory notes" agreeing to pay the full $43.2 million purchase price in cash within 3-6 months.  The Purchaser defaulted on the promissory notes and never paid for the assets, yet he continues to own and control the assets and has not returned them to the AJW Funds.  In entering into this transaction Defendants breached their duty toward the AJW Funds and their investors because they had no good faith basis to engage in the transaction based on the information available to them at the time.

6.      Ribotsky and NIR defrauded investors by failing to conduct any due diligence on the Purchaser or his entities before committing the AJW Funds to the transaction.  Ribotsky and NIR failed to conduct any due diligence despite the fact that NIR's offering materials and investor communications touted that NIR engages in extensive due diligence reviews before making investment decisions on behalf of the AJW Funds.  Had Ribotsky conducted any meaningful due diligence, as he had told investors he would do, Ribotsky would have learned that entering into a multi-million dollar transaction with the Purchaser and his entities was not in the best interests of the AJW Funds because the Purchaser and his entities were not creditworthy counter-parties.  For example, they had no meaningful assets or money to pay for the assets they

were acquiring from the AJW Funds and they had a number of unpaid debts, judgments and liens against them.

7.     Ribotsky further defrauded investors by instructing Dworkin, an NIR employee, to mislead investors by, among other things, falsifying certain documents that were sent to investors.  In particular, in August 2007, Dworkin prepared an investor chart accurately showing that NIR had invested a total of $31.4 million in 57 deals for the relevant period.  After Ribotsky reviewed the chart, he told Dworkin that "investors can't see this" and he instructed Dworkin to "change the number to something near $60 million" before sending it to investors, apparently because Ribotsky wanted investors to see an average investment of at least $1 million per deal. Dworkin followed Ribotsky's instructions and changed the figure to $58.6 million on the chart. The falsified chart was subsequently sent to investors.

8.     Ribotsky also defrauded investors by using money from one group of investors to pay another group of investors without adequately disclosing this to any of the investors.  In May 2007, Ribotsky told investors in an AJW off-shore fund and an AJW on-shore fund that NIR was merging the two funds to create an AJW "master fund."  Ribotsky, however, did not disclose to the investors that the reason he was merging the two funds was to gain access to the cash in the off-shore fund to pay outstanding investor redemptions in the on-shore fund.  At the time, the on-shore fund lacked sufficient cash, or the ability to generate sufficient cash, to pay all of the outstanding investor redemptions.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9.     By virtue of the conduct alleged in this complaint, Ribotsky and NIR, directly or indirectly, singly or in concert, have engaged in and are engaged in transactions, acts, practices, or courses of business that constitute violations of Section 17(a) of the Securities Act of 1933

("Securities Act") [15 U.S.C. §§ 77q(a)], Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and

Sections 206(1), 206(2), 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15

U.S.C. §§ 80b-6(1), (2) and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

10.     By virtue of the conduct alleged herein, Dworkin is liable (a) pursuant to Section

20(e) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78t(e)], for

aiding and abetting NIR's and Ribotsky's violations of Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (b) pursuant to Section

209(d) of the Investment Advisers Act ("Advisers Act") [15 U.S.C. § 80b-9(e)], for aiding and

abetting NIR's and Ribotsky's violations of Section 206(4) of the Advisers Act [15 U.S.C. §

80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act

[15 U.S.C. § 78u(d)(1)], and Section 209 of the Advisers Act [15 U.S.C. §80b-9].

12.     The Commission seeks a judgment (a) permanently enjoining Defendants from

committing future violations of the above provisions of the federal securities laws; (b) ordering

Defendants to disgorge any ill-gotten gains with prejudgment interest thereon; (c) ordering

Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15

U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209

of the Advisers Act [15 U.S.C. §80b-9]; and (d) ordering such other and further relief the Court

may deem just and proper.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action and venue is proper in the Eastern

District of New York pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§

77t(b) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa],

and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].  The

Defendants, directly and indirectly, have made use of the means and instrumentalities of

interstate commerce, or of the mails, in connection with the transactions, acts, practices and

courses of businesses alleged herein.  A substantial portion of the events comprising Defendants'

fraudulent conduct occurred in the Eastern District of New York.  NIR maintains its principal

place of business and offices in this District; Ribotsky and Dworkin reside in this District; and

several investors in the AJW Funds reside in this District.  Furthermore, Ribotsky

misappropriated client assets in this District and made material misrepresentations and omitted to

state material facts when communicating with investors and potential investors while working

out of NIR's offices in this District.

## DEFENDANTS

14.     **NIR** is an unregistered investment adviser located in Roslyn, New York.  NIR

was organized as a limited liability company in November 1999 and is controlled by Ribotsky,

who is the firm's sole managing member.  For a brief period in 2006, NIR was registered with

the Commission as an investment adviser, but NIR withdrew its investment adviser registration

just a few months after registering with the Commission.  At all times relevant to the allegations

in the complaint, NIR provided investment advisory and management services to the AJW Funds

through various wholly-owned affiliated entities that serve as managing members of the

individual funds.

6

15. **Ribotsky**, age 41, resides in Old Westbury, New York.  Ribotsky is the sole managing member of NIR and controls all of the operations and activities of NIR.  Ribotsky does not hold any securities licenses.  Ribotsky attended Brooklyn Law School and NYU Business School for a period of time, but he did not graduate or receive a degree from either institution.

16. **Dworkin**, age 42, resides in Syosset, New York.  Dworkin was an NIR analyst from September 2002 through March 2003.  He later returned to work at NIR as an analyst from April 2004 through April 2008.  On July 7, 2010, Dworkin pled guilty in U.S. v. Daryl Dworkin CR10-515 (EDNY) to criminal charges, including conspiracy to commit securities fraud, arising out of his role in the conduct alleged in this Complaint.

## FACTS

### General Background

#### The AJW Funds

17. The AJW Funds are a group of private investment funds that invest in PIPE transactions.  The AJW Funds were formed in 1999 and were managed by Ribotsky through NIR and its affiliate entities.  According to the AJW Funds' audited financial statements for the period 2000 to 2007, the AJW Funds' assets under management purportedly increased from approximately $17 million in 2000 to over $800 million in 2007.  The last audited financial statements for the AJW Funds are for year-end December 31, 2007.  The AJW Funds' independent auditor has not issued an audit report with respect to the AJW Funds' 2008, 2009, and 2010 year-end financial statements, and NIR has not sent investors any audited financial statements for those years.

18. The AJW Funds were originally comprised of three US-based on-shore funds, AJW Partners, LLC, New Millennium Capital Partners II, LLC, AJW Qualified Partners, LLC,

and one off-shore fund, AJW Offshore, Ltd.

19.     In June 2007, Ribotsky combined AJW Qualified Partners LLC (an on-shore fund) and AJW Offshore, Ltd. (an off-shore fund) to form a master/feeder fund named the AJW Master Fund, Ltd. ("Master Fund").

20.     In October 2008, Ribotsky suspended all investor redemption payments and formed a new set of AJW funds.  The new funds required investors to agree to longer lock-up periods for redemptions in exchange for lower management and performance fees.  The new U.S.-based on-shore funds were New Millennium Capital Partners III, LLC, AJW Partners II, LLC, AJW Qualified Partners II, LLC, and the new off-shore funds were AJW Offshore II, Ltd. and AJW Master Fund II, Ltd. (which were still managed domestically).  In forming the new funds, which employed the same PIPE investment strategy, NIR effectively transferred a portion of the existing AJW fund's assets to the new AJW funds.  NIR sent existing investors new offering documents and subscription agreements for the new AJW funds.  Existing investors were asked to choose whether they wanted to remain in the existing AJW funds or transfer their investments into the new AJW funds.  Most investors elected to transfer their investments into the new AJW funds.

21.     On March 30 and 31, 2011, NIR informed investors in the AJW Funds that NIR was going to unwind and liquidate the AJW Funds.  On April 5, 2011, the Grand Court of the Cayman Islands ("Grand Court") placed the voluntary liquidation of the off-shore Master Fund (which accounts for approximately 70% of all of the AJW Funds' assets) under the Grand Court's supervision.  On May 30, 2011, the Grand Court appointed an independent third-party liquidator for the Master Fund.  Through a series of agreements executed in January, 2012, the third-party liquidator assumed responsibility over the rest of the AJW Funds at issue in this

action.  As of August 9, 2012, in a report to investors this third-party liquidator estimated that at best the realizable value of the assets of the AJW Funds was approximately $20 million, for assets given a valuation by NIR of almost $400 million as of December 31, 2011.

### NIR's PIPE Investment and Trading Strategy

22.     Ribotsky, acting through NIR and its affiliated entities, provided investment advisory and management services to the AJW Funds.  The AJW Funds were typically invested in 120-130 different companies at any given time.  Ribotsky touted the PIPE strategy in investor publications as NIR's "own unique proprietary investment strategy and investment process." The AJW Funds provided cash financing to micro-cap distressed, emerging-growth, and start-up companies quoted on the Over-the-Counter Bulletin Board ("OTC-BB") or the Pink Sheets. Most of the companies in which NIR invested the AJW Funds' money traded for pennies per share, or for fractions of a penny, in very thinly traded markets.  Some of the companies did not trade at all.  NIR purportedly provided the companies financing in "tranches" that it claimed extended over 2-4 years.

23.     The AJW Funds typically received convertible debentures that paid an annual interest rate of 4% to 12% and had a default penalty of 15% that applied to unpaid principal and interest at the time of maturity.  The outstanding principal and interest under the debentures were purportedly convertible into the borrower's common stock at a discount (ranging from 35% to 85%) to the stock's market price at the time of conversion.  Because the contractual terms of the financing provided that the debt would always be converted at a discount to the share's market prices at the time of conversion, NIR recorded a "paper profit" (as unrealized gains) when the PIPE deals closed, and NIR accreted the unrealized gains over a 90 day period.

24.     NIR represented to investors that it would convert the paper profits (unrealized

9

gains) to cash income (realized gains) by selling the discounted shares in the open market. The "convert and sell" trading aspect of NIR's investment strategy allowed it to record the cash income received from selling stock in the open market as realized gains on the AJW Funds' books and records and financial statements.

25.     Ribotsky represented to investors that NIR could "liquidate" or "exit" all of the AJW Fund's PIPE investments (*i.e.*, fully convert the debentures to stock and sell the stock) within 36 to 48 months. Many investors were told that even shorter time frames were achievable.

**NIR's Performance History And Management Fees**

26.     According to the AJW Funds' audited financial statements for the years ending 2000 to 2007, NIR recorded a total of $407 million in returns during that period. Most of the returns, however, were from NIR's write-up each year of the purported fair value of the PIPE investments in the AJW Funds' portfolio and not from realized trading profits from converting the loans to stock and selling the stock in the market.

27.     NIR earned management fees equal to 2% of the AJW Funds' assets and performance fees equal to 20% of the AJW Funds' supposed annual profits, which consisted of realized and unrealized gains. According to the AJW Funds' audited financial statements, NIR earned approximately $126 million in management and performance fees during the period 2000 through 2007.   Of this amount, approximately $37 million was from management fees and approximately $89 million was from performance fees.

28.     As discussed above, the AJW Funds' independent auditor never issued an audit report with respect to the AJW Funds' 2008, 2009, and 2010 year-end financial statements, and NIR never sent investors audited financial statements for those years.

**Failure of NIR's Investment and Trading Strategy**

29.     By mid to late 2007, if not earlier, NIR's strategy of investing in distressed and start-up companies began to show signs of failure.  Many of the distressed companies that the AJW Funds had made loans to were by then essentially defunct or on the verge of filing for bankruptcy.  They were no longer engaging in any meaningful business operations, had "going concern" reports from auditors, were delinquent in their periodic and other filings, and were trading, if at all, primarily on the Pink Sheets for miniscule fractions of a penny.  Accordingly, the companies that the AJW Funds had loaned money to in prior years were now defaulting on their loan and conversion obligations in 2007.

30.     In order to avoid the possibility that NIR would need to write-down the fair value of the AJW Funds' investments in delinquent and non-performing companies, Ribotsky chose to "restructure" the outstanding debt by issuing new debentures to the same delinquent and non-performing companies.  Ribotsky rolled the outstanding principal, interest, and default penalties into new debentures and negotiated greater conversion discounts for the issuers' shares. Although this restructuring strategy contractually entitled the AJW Funds to a greater number of shares, for most of the companies, there was little, if any, trading volume for their stock by late 2007.  By restructuring the loans in this manner, NIR ended up recording more and more unrealized gains for the investments and avoided having to disclose to investors what otherwise would have been an ever-growing number of defaulted loans held by the AJW Funds. Defendants utilized this pattern of defaults to increase the unrealized gains of the AJW Funds, the amount of assets under management, and thus the amount of the management and performance fees to which they were entitled.  Defendants did not disclose that an increasing number of their transactions were simply a result of trying to avoid recognizing losses by instead

restructuring a non-performing asset into a higher number of shares, which was a material omission.

31.    The practical effect of the debt restructurings, however, was that it would be difficult or impossible for NIR fully to "monetize" these PIPE investments – that is, fully convert the unrealized gains to realized gains – because there was insufficient trading volume to sell the billions of shares that the AJW Funds were now contractually entitled to under the terms of the restructured debentures.

32.    Despite the fact that by 2007 it was unlikely that NIR could ever fully convert and liquidate most of the PIPE investments, NIR was still reporting double digit performance returns for the AJW Funds.

33.    NIR also avoided having to recognize losses or write-downs by rejecting the offers of portfolio companies to redeem their debentures.  Rather than do so at a loss from face value, Defendants preferred to roll over defaulting debentures into new ones, even though these had no realistic chances of being repaid, and even though Defendants had little chance of being able to realize gains (or, in some instances, to recover the principal amount of the loans). Defendants never disclosed to investors that they declined the chance to realize some gains, albeit at some loss from face value, preferring to incur phantom unrealized gains on which management and performance fees could be charged.

34.    NIR continued to earn management and performance fees that were calculated, in part, by reference to the period-over-period increase in unrealized gains for the AJW Funds' now illiquid PIPE investment portfolio.  For example, during the first six months of 2008, NIR earned approximately $7.5 million in management fees.

12

**The Funds' Independent Auditor Tells Ribotsky It Will Take
Decimals, if Ever, to Liquidate the Funds' PIPE Investments
Under NIR's Stated Investment and Trading Strategy**

35.     In connection with the audit of the AJW Funds' 2007 year-end financial

statements, the AJW Funds' independent auditor (the "Auditor") analyzed the amount of time it

would take NIR to liquidate the PIPE investments under NIR's stated investment and trading

strategy.  Based on several different audit procedures that the Auditor performed in early 2008,

the Auditor calculated that it would take NIR decades, if ever, to liquidate the AJW Funds' PIPE

investments.  The Auditor met with Ribotsky several times over the course of January, February

and May 2008 to discuss the results of their analyses and provided him with their audit work

papers detailing their analyses.

36.     One of the audit procedures that the Auditor conducted was an "aging analysis" of

the AJW Funds' PIPE investment portfolio.  This analysis concluded that it would take NIR 25

years to liquidate just one-half of the PIPE investment portfolio and an unspecified amount of

time beyond 25 years to liquidate the remaining half.  In fact, the Auditor's work papers note that

that actual number of years it would take to liquidate the PIPE investments was even greater

because the aging analysis assumed that NIR was the only party selling stock in the thinly traded

markets for these securities, which would not be the case.  The aging analysis was based on 2007

market conditions, including the companies' share price on December 31, 2007 and the average

daily trading volume over a six month period leading up to that date.

37.     In another analysis, called a "turnover analysis," the Auditor calculated that it

would take NIR approximately 11 years to liquidate the entire PIPE investment portfolio.  This

analysis was based on NIR's 2007 rate of turnover for the PIPE investment portfolio.  The

Auditor calculated that NIR liquidated approximately 9% of the PIPE investment portfolio in

13

2007 and, at that rate, it would take approximately 11 years to liquidate the entire PIPE investment portfolio.

38.     The Auditor also performed an analysis of the AJW Funds' top 25 PIPE investments to determine how long it would take NIR to liquidate these investments, which accounted for 62% of the total value of the AJW Funds' PIPE investment portfolio.  The Auditor calculated that, as of December 31, 2007, only 3 out of the 25 investments could be liquidated in 4 years or less.  The Auditor calculated that it would take tens and, in some cases, hundreds of years to liquidate most of the PIPE investments under NIR's stated investment and trading strategy.  In fact, the Auditor calculated that 2 PIPE investments would take over 700 years to liquidate and that 3 PIPE investments were in companies that had no trading activity at all for their common stock.  This meant that it was unlikely that these PIPE investments could ever be liquidated in the open market.

39.     For example, one of the AJW Funds' largest PIPE investments was a $6.8 million principal investment in a company called Modern Technology, Corp. ("MODC"), which was a Pink Sheet stock that had been delisted from the OTC-BB on October 25, 2006 for failing to file required financial reports.  The Auditor's analysis revealed that, as of December 31, 2007, NIR was carrying this investment on the AJW Funds' books at a discounted fair value of $16.8 million, which was based on the AJW Funds' contractual right to convert the outstanding loan amount into 27 billion shares of MODC stock, which was quoted for $0.001 per share on the Pink Sheets as of December 31, 2007.  Based on the six month average daily trading volume, which was just 145,295 shares per day, the Auditor calculated that it would take NIR approximately 751 years to fully convert and sell out of this investment in order to liquidate (*i.e.*, fully convert to cash) under NIR's stated investment and trading strategy.

40.     The following is a summary of the Auditor's calculations for the number of years it would take NIR to liquidate the AJW Funds' Top 25 PIPE investment under NIR's stated investment and trading strategy:

| AJW Funds Top 25 12/31/2007 | | | |
|---|---|---|---|
| Company | Total Shares (Convertible) | Price Per Share | Est. Years to Fully Convert/Sell |
| MHGI | 188,133,397,544 | $0.00019 | 95 |
| TXTG | 4,716,667 | $0.75 | 20 |
| DLAV | 12,206,262,745 | $0.00388 | 4 |
| EPCG | 133,626,458,246 | $0.00019 | 137 |
| CCNG | 233,423,636,923 | $0.00013 | 711 |
| MODC | 27,165,483,400 | $0.001 | 751 |
| CYBL | 853,979,379 | $0.0255 | 0 |
| ACTK | Not Traded | Not Traded | Not Traded |
| CYDF | 3,419,062,087 | $0.00631 | 8 |
| WTVN | 25,886,054,761 | $0.00113 | 27 |
| GLBT | 194,157,196,923 | $0.00013 | 43 |
| GRWW | 3,060,022,063 | $0.007 | 32 |
| PFEH | 50,004,640,632 | $0.00038 | 96 |
| CYSG | 133,357,891,154 | $0.00013 | 140 |
| MGWL | Not Traded | Not Traded | Not Traded |
| DIBZ | Not Traded | Not Traded | Not Traded |
| ASVN | 57,297,025,161 | $0.00031 | 12 |
| AVTI | 4,175,406,116 | $0.00419 | 8 |
| SSHS | 24,153,329 | $0.30 | 99 |
| BNYN | 10,424,152,107 | $0.00138 | 10 |
| ABPH | 3,354,056,010 | $0.004 | 20 |
| INSN | 103,916,252,747 | $0.00013 | 41 |
| IGAI | 24,337,922,632 | $0.00038 | 31 |
| ITRO | 4,741,356,611 | $0.00263 | 1 |
| ADMH | 4,108,354,114 | $0.003 | 8 |

## The Fraudulent Conduct

### Misappropriation of Fund Assets

41.     Sometime after forming the AJW Funds in 1999 and 2000, Ribotsky and a business partner decided to set up a private company to make personal PIPE investments for themselves.  They formed a private investment vehicle called Equilibrium Equity, LLC ("Equilibrium") which made the same type of PIPE investments that the AJW Funds were making.  That is, they made loans to micro-cap companies in exchange for debentures that allowed the loans to be converted into the issuers' stock.  Sometime after forming Equilibrium, Ribotsky bought out his partner.  Ribotsky then became the sole member of Equilibrium and, therefore, the sole owner of the convertible debentures that constituted Equilibrium's sole assets.

42.     In July 2004, Ribotsky decided to personally invest in one of the funds he was managing – the AJW Qualified Fund.  However, instead of investing in the fund by making a payment  to the AJW Qualified Fund, Ribotsky chose to make an "in-kind" investment by assigning and transferring to the AJW Qualified Fund all of the assets (convertible debentures) that Ribotsky owned through his private company, Equilibrium.  Ribotsky transferred all of Equilibrium's debentures, which he valued at $581,525, to the AJW Qualified Fund in July 2004.  At that point, Ribotsky became an investor in the AJW Qualified Fund under the same terms and conditions as the other investors in the fund and he relinquished all of his direct ownership interest in the debentures which he previously owned through Equilibrium.  After the transfer of these assets, Equilibrium had no assets, expenses, income, or distributions, and was nothing more than an empty shell.

43.     Almost immediately after making his personal investment in the AJW Qualified Fund, Ribotsky began to misappropriate assets from that fund for his personal use.  From August

16

2004 through June 2009, Ribotsky converted the debentures that he had transferred from Equilibrium to the AJW Qualified Fund into the issuers' common stock.  Ribotsky then arranged to have the stock delivered to an Equilibrium brokerage account instead of an AJW Qualified Fund brokerage account.  Ribotsky then sold the stock in the open market and transferred the cash proceeds to an Equilibrium bank account instead of an AJW Qualified Fund bank account.  In total, between August 2004 and June 2009, Ribotsky generated approximately $1,060,000 in cash proceeds in the Equilibrium brokerage and bank accounts by converting debentures and selling stock that belonged to the AJW Qualified Fund.  Ribotsky misappropriated nearly all of this money for his personal use, as described below.

44.     Between June 2006 and April 2008, Ribotsky withdrew $155,500 in cash from Equilibrium's bank account by writing checks to himself or to cash.  Ribotsky instructed office employees to take the checks to a local bank, cash them, and give him the money.  In addition, between August 2004 and March 2008, Ribotsky misappropriated additional money from the sale of stock that belonged to the AJW Qualified Fund and its investors as follows:  (i) writing checks totaling $24,681 for Lexus and Mercedes car payments; (ii) writing a check to a jewelry store for $15,750 to purchase a Rolex watch; (iii) withdrawing $19,000 in cash from ATM machines; (iv) spending $23,000 for audio and computer services for his home residence; and (v) transferring nearly $815,000 to various personal bank accounts or accounts under his control that were not accounts that belonged to AJW Qualified Fund.

45.     At some point in 2004, NIR's Chief Financial Officer ("CFO") told Ribotsky that Ribotsky could not take for himself the money in the Equilibrium accounts that came from the conversion of debentures and the sale of stock that belonged to the AJW Qualified Fund and its investors.  Ribotsky told the CFO "not to worry about it" and he continued to take the money for

himself.

46.     When NIR's outside accountant saw that Ribotsky had taken improper distributions, and had reclassified these distributions as loans notwithstanding the lack of any indicia of a loan such as loan documentation or interest payments, the outside accountant advised Defendants that Ribotsky could not take the funds at issue in this manner.  At this time, Ribotsky was advised that there was no basis for any distribution, that the amount taken exceeded his capital account, and that the account had not generated any income that would justify a distribution.  Ribotsky was further advised that if he was going to treat the funds as a loan, he had to pay the funds back.

47.     No loan documents were ever executed that would indicate the funds were taken pursuant to a loan; nor did Ribotsky ever pay any interest thereupon or repay any principal.

48.     At no time were investors in any of the AJW Funds informed that the principal had misappropriated moneys belonging to the AJW Qualified Fund for himself, that NIR's head accountant directed him not to do so, or that NIR's outside accountants told Ribotsky he could not take the funds in this fashion.  This transaction also was not disclosed to the fund client, *i.e.*, the AJW Qualified Fund, as neither the purported loan nor the diversion of cash by the fund manager was reflected on its audited financial statements.

## False and Misleading Statements and Omissions of Material Fact

### Time Required to Liquidate the AJW Funds' PIPE Investments

49.     Investors frequently raised questions regarding the liquidity of NIR's investments. Defendants advised investors that NIR only invested in companies without liquidity problems.

50.     In 2007 and 2008, Ribotsky told investors and prospective investors that NIR could "liquidate" or "exit" all of the AJW Funds' PIPE investments in 36 to 48 months.

18

Ribotsky continued to tell this to investors even after the Auditor showed Ribotsky their analyses calculating that it would take NIR decades, if ever, to liquidate all of the AJW Funds' PIPE investments under NIR's stated investment and trading strategy.

51.     Ribotsky participated in almost every meeting with prospective investors.  These misrepresentations about the time to exit investments were made to investors in all funds at numerous meetings, and were common to all NIR efforts to market the AJW Funds.  Ribotsky directed other NIR personnel to represent to investors that NIR could exit its investments within two to four years.

52.     Investors were told by Ribotsky personally in pitch meetings that NIR could monetize/exit any investment within two to three years.  Prospective investors were also promised in these meetings that, if need be, NIR could rapidly monetize up to 75% of the AJW Funds' portfolios, or that NIR could sell out of its entire portfolio within three years.  These representations were bolstered with statements in NIR's written marketing materials regarding a "two to four year time frame" applicable to the company's "liquidation parameters."

53.     Defendants also made these misrepresentations, both orally in numerous meetings in New York and elsewhere in the United States, and in writing, to various marketers who raised money for the fund by introducing prospective investors.  These marketers then conveyed these false statements to both prospective domestic and off-shore investors.

54.     The following are illustrative examples of written representations made to some investors, and are only a partial listing of such representations.  Ribotsky made the following false and misleading statements to certain investors:

(a)     **October 21, 2008 email from Ribotsky to investor**
        *Investor*:  "How much in proceeds could you realistically have raised if you had to convert as much as you could and tried to sell the converted shares?"

*Ribotsky*: "[W]e could if needed sell the entire portfolio in 36 months getting the current NAV.  If we were to want to fire sale it, the time would be less, but we may not get the exact discounted market value we carry the investments at."

(b) **March 30, 2008 email from Ribotsky to investor, attaching Due Diligence Questionnaire signed by Ribotsky**
*Q*:      Describe your strategy (in as much detail as possible):
*A*:      N.I.R. specializes in private placements in public small capitalization companies . . . PIPE's are structured as convertible preferred securities, or secured convertible debt that converts to common stock, Full Liquidation could take from 1 to 4 or more years.

(c) **July 17, 2008 email from Ribotsky to investor**
*Ribotsky*: "We usually look at the total sale of the whole portfolio if we were going to sell it all in approximately 36 to 48 months."

(d) **October 16, 2008 letter signed by Ribotsky to investors**
*Ribotsky*: "[I]t is generally expected to take approximately 36 months or longer to successfully sell the securities of all of the portfolio companies held by the [AJW Funds]."

(e) **October 1, 2007 email from Ribotsky to investor**
*Investor:* "How liquid is your portfolio?  How fast can you liquidate 50%, 75% and 100%?"
*Ribotsky*: "As you know unlike most we always have 15-25% in cash at all times . . . [and] [t]o liquidate the remaining 75% in total in a complete liquidation of the fund we would say approximately 36 months."

55.      Ribotsky's statements above, as well as similar ones made to other investors, and third-party marketers, representing the length of time it would take NIR to liquidate the AJW Funds' portfolio of PIPE investments were materially false and misleading in light of the market conditions at the time and the historical performance of the AJW Funds.  The statements were false because by late 2007 most of the AJW Funds' PIPE investments were convertible into billions of shares of stock in companies that traded for mere fractions of a penny and had little, if any, trading volume in relation to the billions of shares that the AJW Funds were contractually entitled to receive.  Therefore, it would take decades, if ever, for NIR to convert and sell the stock in those companies in order to liquidate the AJW Funds' PIPE investments under NIR's

20

stated investment and trading strategy.  Not only did Defendants omit these material facts, they

also misrepresented the amount of the assets of the AJW Funds' portfolios that were illiquid,

telling some investors that only a very small portion – in some instances 3% or less – of the

portfolios assets were illiquid.

      56.     In fact, as of December 31, 2007, at least seven companies in which the AJW

Funds had invested did not trade at all and, therefore, there was no trading market for NIR to sell

the stock of these companies.  The Auditor met with Ribotsky in early 2008, and showed him

their analyses calculating that the length of time it would take NIR to liquidate the AJW Funds'

PIPE investments under NIR's stated investment and trading strategy was nowhere close to the

36 to 48 month period Ribotsky was telling investors.  Therefore, Ribotsky knew, or was at least

reckless in not knowing, that his statements to investors about the length of time it would take

NIR to liquidate the PIPE investments were false and misleading at the time he made them.

      57.     Furthermore, many conversions could not be completed because, in some

instances portfolio companies failed to pay their transfer agents.  Consequently, the transfer

agent would not deliver the conversion stock, making it impossible to convert.

      58.     There is no dispute Ribotsky was aware of the severe liquidity problems related

to the funds' PIPE investments irrespective of any red flags raised by his auditor.  Ribotsky was

the only individual at NIR authorized to convert and sell stock.  He had real-time access to all

relevant fund conversion and trading metrics and controlled every aspect of this liquidity

measure.  He was also fully aware that his PIPE investments were not generating cash interest

payments.  Ribotsky was aware of these problems throughout 2007 and the meetings with the

auditors in 2008 only served to reaffirm these severe liquidity problems.  Defendants were also

aware during this time period that absent converting and selling shares there was no practical

way to realize gains, since almost no portfolio companies paid interest on the loans or redeemed

the loans.

59.     Ribotsky's statements were also misleading because Ribotsky omitted material

information when making the statements to investors.  In order to make Ribotsky's statements to

investors not misleading, Ribotsky should have told investors, at a minimum, that the 36 to 48

month exit period he was representing was not possible under the market conditions existing in

late 2007 and 2008.  By failing to disclose this relevant and material information when

communicating with investors, Ribotsky misled investors into believing that, despite the adverse

market conditions of late 2007 and 2008, NIR could still fully liquidate the AJW Funds' assets in

36 to 48 months.

**Additional False and Misleading Statements and Omissions of Material Fact**

60.     In addition to the false and misleading statements Ribotsky made to investors in

late 2007 and 2008 about the time it would take to liquidate the AJW Funds' assets, Ribotsky

made other false and misleading statements in late 2007, 2008, and 2009 about the AJW Fund's

liquidity and performance.

61.      The following statement made by Ribotsky was false and misleading:

> **October 21, 2008 email from Ribotsky to investor**
> ***Investor***: "What are the proceeds from converted stocks you have sold this month
> of October?"
> ***Ribotsky***:  "We typically sell $5 million to $15 million a month.  This month
> [October] has been a little slower while September was a little better."

62.     Ribotsky's answer to this investor's question was false and misleading because

the AJW Funds' monthly stock sales proceeds for September and October 2008 were nowhere

near the $5 to $15 million monthly range that Ribotsky referenced in his email.  In fact, the AJW

Funds' monthly stock sales proceeds for September and October 2008 were just $277,561 and

$131,802, respectively.  Moreover, from February to October 2008, the AJW Funds' monthly proceeds from selling stock never exceeded $1 million.

63.  The investor to whom Ribotsky sent this false and misleading statement subsequently invested his IRA savings in the AJW Funds in early 2009.

64.  The following statement made by Ribotsky was false and misleading:

**November 7-8, 2007 email from Ribotsky to investor**
***Ribotsky*:**  "But in this case [ABPH] the liquidity of the deal is within the time frame [2-4 years] we have allotted for it . . . ."

65.  Ribotsky's statement was false and misleading based on the 2007 market data available to him at the time he made the statement.  According to the Auditor's subsequent calculations, which were based on essentially the same market data, the exit period for the particular investment Ribotsky was referring to in his email – ABPH – was approximately 20 years.

66.  The following statement made by Ribotsky was false and misleading:

**March 30, 2008 email from Ribotsky to investor, attaching Due Diligence Questionnaire signed by Ribotsky**
***Q*:**      "What is the longest term held security in the fund and why?"
***A*:**      "5 years but extremely small positions that continue to be slowly being [sic] sold into the market."

67.  This statement was false and misleading because Ribotsky knew at the time he made it that the AJW Funds had a number of PIPE investments that were older than 5 years.  In fact, the AJW Funds had PIPE investments in at least 15 companies that dated as far back as 2000, 2001 and 2002.  These investments were still being carried on the AJW Funds' books, presumably because they were illiquid and NIR could not fully convert and sell out of these positions under NIR's stated investment and trading strategy.

68.    The following statement made by Ribotsky was false and misleading:

**December 10, 2008 email from Ribotsky to investor**
***Investor***: "When I inquired a few months ago, you had not yet had any defaults or bankruptcies in your portfolio but indicated that is always a possibility.  Have there been any defaults or bankruptcies since?"
***Ribotsky:*** "No defaults or no bankruptcies."

69.    Ribotsky's statement was false and misleading because several companies in which the AJW Funds were invested had, at the time, already defaulted in 2008.  On June 13, 2008, Ribotsky was copied on an internal NIR email advising him that 2 portfolio companies were in default.  The email read: "PFMS . . . defaulted as of 4/18 [and] RKLC . . . defaulted as of 5/2."  Therefore, Ribotsky knew that at least two companies had defaulted in 2008 when he told the investor there were "no defaults."  In addition, another internal NIR email, dated August 21, 2008, from an NIR analyst lists at least 3 companies that were in default:  "Companies in default are ADMH, RKLC, UNVC."  Although Ribotsky is not listed as a recipient of this email, the email was circulated within NIR and was based on the research of an NIR employee.  Therefore, this information was certainly available to Ribotsky when he told the investor that there were no defaults in 2008.  This is the same investor who invested his IRA savings in the AJW Funds in early 2009.

70.    The following statements made by Ribotsky were false and misleading:

(a) **June 30, 2008 email from Ribotsky to investor**
***Investor***:  "Can you please tell me what the status [is of the AJW Funds' 2007 audited financial statements] and why this is taking longer than expected?"
***Ribotsky:*** "Unfortunately they [the Auditor] have taken longer this year and with our switch to the master/feeder structure have to do some additional audit procedures. Further to that there are new auditing standards for all funds that are creating some backlog throughout the auditing community."
***Investor***:  "We know that dealing with an external auditor can take more time then [sic] expected.  I just want to check if this is the only reason for the delay."

24

*Ribotsky*: "Yes this is the only reason for the delay."

(b) **January 14, 2009 email from Ribotsky to investor**
*Investor*: "Why was the audit for 2007 not issued until August 14, 2008?"
*Ribotsky:* "The 07 audit was delayed due to personnel changes at the auditor."

71.     Ribotsky's answers were false and misleading because the delay in the 2007 audit of the AJW Funds' financial statements was due to the Auditor's concerns about whether NIR was properly recording the fair market value of the PIPE investments.  The delay was not due to personnel changes at the Auditor or to the switch to the master feeder fund structure, as Ribotsky told the investors.  In response to the Auditor's valuation concerns, and at the Auditor's request, NIR retained a third-party valuation expert in June 2008 to review the methodology that NIR was using to record the fair market value of the PIPE investments.  The third-party valuation expert completed its report in July 2008.  The Auditor subsequently concluded its audit work and issued an unqualified audit report for the AJW Funds' year-end December 31, 2007 financial statements in August 2008.  Ribotsky's failure to mention the real reason for the audit delay – that the Auditor had concerns about whether NIR was properly recording the fair market value of the PIPE investments and, therefore, required additional audit procedures – rendered Ribotsky's answers to the investors' questions about the audit delay false and misleading

72.     The following statement made by Ribotsky was false and misleading:

**March 16, 2008 newsletter signed by Ribotsky to investors**
"In terms of [Q4 2007] deal highlights, the following are examples of two companies that we added to our portfolio . . . The first company is a developer of environmental process technology for photochemical, silver, and water recycling . . . The second portfolio company is focused on becoming the content management system for social networks and small business markets."

73.     Ribotsky's statement was false and misleading because the two companies described in the newsletter were not "added to [the] portfolio."  Rather, they were existing

portfolio companies that NIR simply provided additional financing to during the fourth quarter of 2007.  The ability of NIR to continue making investments in new companies was important to investors because it demonstrated to investors that, despite the adverse market conditions in late 2007 and 2008, there was still a market for NIR's PIPE investment strategy.

74.     Defendants lied about the educational background of its principal.   For example, the 2006 Offshore Private Placement Memorandum claimed that Ribotsky "received an MBA in finance and operations from New York University, Leonard N. Stern Graduate School of Business."  This was false.  Ribotsky also gave the erroneous impression to investors at in-person meetings that he was a lawyer and had an MBA.

75.     The false and misleading statements and omissions of material facts alleged above were made in the offer or sale and in connection with the purchase or sale of securities because they were made to prospective and existing investors, many of whom made subsequent investments in the AJW Funds.  For example, Ribotsky offered the March 30, 2008 email and attached due diligence report, described above, to a prospective overseas investor.  After receiving the email and due diligence report, the overseas investor invested $25 million in the AJW Funds in May 2008.  Moreover, Ribotsky sent the July 17, 2008, October 21, 2008, December 10, 2008, and January 14, 2009 emails, described above, to the same prospective domestic investor who, after receiving the emails, invested $122,256 of his IRA money with the AJW Funds in early 2009.

76.     In addition, Ribotsky sent the October 16, 2008 letter, described above, to existing investors asking them to invest in newly-created AJW funds.  The first sentence of the October 16, 2008 letter states:  "We [NIR] are . . .  offering you interests in a newly-organized entity. . . ." NIR sent existing investors private placement memoranda and subscription agreements

26

concerning the newly-created AJW funds.  Existing investors who chose to invest in the newly-created AJW funds did so by executing subscription agreements that represented their portion of ownership in the new AJW funds.

**Falsification of Investor Documents**

77.     Ribotsky further defrauded investors by instructing Dworkin, an NIR employee, to mislead investors by, among other things, falsifying certain documents that were sent to investors.  In particular, in August 2007, Ribotsky instructed Dworkin to inflate the total amount of investor money that NIR had invested in 57 deals during the first seven months of 2007 (through July 31, 2007).  Dworkin initially prepared the chart accurately showing that NIR had invested a total of $31.4 million in the 57 deals for the relevant period.  Dworkin then sent the chart by email to Ribotsky on August 13, 2007.

78.     After Ribotsky reviewed the chart that Dworkin had prepared, Ribotsky stated "investors can't see this" and he instructed Dworkin to "change the number to something near $60 million" before sending it to investors, apparently because Ribotsky wanted investors to see an average investment of at least $1 million per deal.  Indeed, the size of the specific deal fundings was a frequent point of inquiry by investors, which is why this investment metric was included in the document when it was created.  Dworkin followed Ribotsky's instructions and changed the figure to $58.6 million on the chart.  The next day, August 14, 2007, Ribotsky sent the falsified chart by email to at least one on-shore investor.  The falsified chart was also sent to at least one other United States based off-shore investor on October 15, 2007.

**The $43.2 Million Sale of Fund Assets and Other Issues Regarding the Purchaser**

79.     By at least the fourth quarter of 2008, Ribotsky knew that NIR's investment and trading strategy could not generate enough cash from selling stock to keep up with mounting investor redemption requests and that NIR was, in fact, starting to incur trading losses.  The AJW

Funds suffered nearly $3.9 million in realized trading losses in the month of October 2008 alone. Faced with the reality that his investment strategy would result in significant fourth quarter 2008 realized trading losses – and likely year-end realized trading losses as well – Ribotsky entered into a series of transactions in which he purported to sell some of the AJW Funds' assets (PIPE investments in the form of convertible debentures) that NIR valued at $43.2 million to the Purchaser and certain entities controlled by the Purchaser.

80.     In November and December 2008, Ribotsky (on behalf of the AJW Funds) and the Purchaser (on behalf of his entities) entered into nine separate transactions in which the AJW Funds purportedly sold $43.2 million of convertible PIPE debentures to the Purchaser's entities. The debentures that Ribotsky purported to sell the Purchaser had a face value of $12.6 million, which represented the AJW Funds' principal investment in the companies that issued the debentures. The Purchaser, however, did not pay cash for the debentures; rather, he signed a series of "promissory notes" agreeing to pay the full purchase price in cash within 3-6 months. The Purchaser also executed a "personal guarantee" promising to personally pay the full purchase price for the debentures in the event his entities could not do so.

81.     These transactions, however, were not in the best interests of the AJW Funds and its investors, and Ribotsky did not perform any due diligence with respect to the Purchaser or his entities before entering into the transactions. Ribotsky entered into the transactions in the hopes of being able to hide the trading losses that the AJW Funds were incurring in the fourth quarter of 2008. In fact, by recording the proceeds from the debenture transactions as "sales" on the books and records of the AJW Funds, NIR recorded $18 million in net realized gains on the 2008 AJW Funds' books and records. Without the proceeds from the debenture transactions, however, the 2008 AJW Funds' books and records would have reflected net realized losses of $3.4 million.

28

82.     The Purchaser defaulted on his payment obligations and to this date, he has not paid for the debentures.  The Purchaser and his entities have control and possession of the debentures.  Ribotsky has not commenced any legal action on behalf of the AJW Funds to seek payment for the debentures or their return to investors.  Nor has Ribotsky disclosed to the investors that he arranged for the AJW Funds to sell $43.2 million of their assets, that the Purchaser defaulted on his payment obligations, and that the AJW Funds no longer have possession or control of the assets.

83.     Ribotsky and NIR defrauded investors by failing to conduct any due diligence with respect to the Purchaser and his entities before entering into the multi-million dollar transaction with them.  Ribotsky and NIR failed to conduct any due diligence despite the fact that NIR's offering materials and investor communications touted the "extensive" due diligence that NIR would conduct before making investment decisions on behalf of the AJW Funds.  Marketing materials sent to investors represented that there would be "ongoing due diligence" and that NIR would "monitor positions" on a going forward basis, stating that after "the investment is made the due diligence process continues on a regular basis."

84.     Ribotsky and NIR also made the following disclosures to investors relating to NIR's due diligence protocols:

(a)     **NIR Quarterly Newsletter signed by Ribotsky to investors, October 2008**
"NIR does extensive due diligence and credit work on all transactions."

(b)     **AJW Qualified Partners II, LLP Private Placement Memorandum, October 2008**
"The Investment Manager believes that the first and most essential step to successful investing is the identification and uncovering of as much information as possible about an investment opportunity.  This process is facilitated by the extensive primary research conducted by the Investment Manager on businesses and industries."

(c) **NIR Investor Presentation, (undated)**

"Extensive due diligence is performed before any investment is made. . . . [t]he process entails detailed descriptions and analysis of all pertinent financial, legal, and accounting information both past and present."

85. Despite these, and other similar, due diligence related representations made to investors, Ribotsky and NIR did not conduct any due diligence with respect to the Purchaser or his entities before entering into the transactions with them in November and December 2008. Ribotsky and NIR did not request or receive any documentation to assess the creditworthiness of the Purchaser and his entities, or to verify that the Purchaser and his entities had any meaningful assets or the financial means to pay for the debentures.

86. Ribotsky's prior business dealings with the Purchaser should have placed Ribotsky on notice, if he was not already, that entering into the multi-million dollar transaction with the Purchaser was not in the best interest of the AJW Funds.  Prior to entering into the debenture transactions in November and December 2008, Ribotsky knew, and in fact he had told others, that the Purchaser's character and reputation for honesty were suspect.  For example, in an email to a co-worker, dated April 30, 2008, Ribotsky wrote:  "[The Purchaser] is a thief [sic] and crook."  In another email, dated February 19, 2008, Ribotsky wrote:  "[The Purchaser] has a checkered past and now his reputation preceeds [sic] him."  Ribotsky also knew, prior to November and December 2008, that the Purchaser paid bribes to an NIR employee in order to secure investments from the AJW Funds in start-up companies that the Purchaser was representing.  Ribotsky learned about these bribes in September 2008, which was two months before Ribotsky entered into the transactions to sell AJW Fund assets to the Purchaser.

87. Had Ribotsky or NIR performed any meaningful due diligence with respect to the Purchaser and his entities, as Ribotsky told investors NIR would do, Ribotsky would have known that entering into a multi-million dollar transaction on behalf of the AJW Funds with the

Purchaser and his entities clearly was not in the best interest of the AJW Funds.  In particular, Ribotsky would have known that the Purchaser had a long history of personal and business credit problems and outstanding judgments and that neither the Purchaser nor his entities had any meaningful assets or the financial means to pay for the debentures.

88.     In fact, the Purchaser had less than $30,000 in the bank account of his entities at the time of the transactions in November and December 2008.  Although at one point the Purchaser gave Ribotsky a $700,000 check towards the debenture purchases, the Purchaser subsequently stopped payment on the check before it was cashed.  As of the date on the check, April 12, 2009, there was less than $500 in the bank account on which the check was written. The Purchaser was also personally in debt and had limited financial means and credit.  At the time, there were multiple collection matters and judgments against the Purchaser for over $270,000 in unpaid telephone, credit card, and department store bills.  Even a cursory review of publicly available records would have shown that the collectability of the $43.2 million from the Purchaser and his entities was highly unlikely within the 3-6 month payment period under the terms promissory notes, if ever.

89.     Despite this alarming conduct and negative characterizations of the Purchaser, Ribotsky still proceeded with the sale.  This was a clear breach and departure from Ribotsky's fiduciary duties to the fund clients and investors.  For example, several on-shore AJW Fund PPM's contain the following affirmative fiduciary duty representation entitled "Fiduciary Responsibilities of the Manager":

> "The Manager is accountable to the . . . Members as a fiduciary
> and consequently must exercise the utmost good faith and integrity
> in handling company affairs.  The Manager must provide  . . .
> Members (or their representatives) with timely and full information
> concerning matters affecting the activities of the Company,
> including its formation, liquidation . . ."

90.    Moreover, *after* Ribotsky and the Purchaser entered into the last of the transactions on December 30, 2008, Ribotsky retained a private investigator to conduct a background check into the Purchaser.  The investigator sent Ribotsky a detailed report on January 4, 2009 that, among other things, raised multiple red-flags about the Purchaser and his entities.  In particular, the report listed the Purchaser's poor financial condition and the several outstanding collection matters and judgments against him and his entities.  In fact, the very first page of the report cautioned Ribotsky as follows:

> This memorandum provides a rather disturbing background report on [the Purchaser]. . . . The information on [the Purchaser] was so disturbing to us that we went to extra measures to verify these data and to assure ourselves that all this negative information was indeed applicable to the subject and not the result of a confused identity.  We are comfortable with the accuracy of this report but leave it to you to decide on how to proceed in any business dealings here.

91.    The report is dated January 4, 2009 – just days after Ribotsky closed the last debenture transactions with the Purchaser on December 30, 2008.   Indeed, the fact that Ribotsky retained a private investigator to conduct an expedited background check on the purchaser immediately following the transactions is consistent with the above-referenced due diligence disclosures and the "Fiduciary Responsibilities of the Manager" representation.

92.    Notwithstanding the fact that no payment was ever made in connection with this transaction, Defendants took no action to enforce the terms of the transaction.  Defendants never instituted litigation to enforce the contracts, or sought the return of the fund assets.  Nor did Defendants seek to obtain any of the proceeds of any sales of the underlying debentures by the Purchaser, even though they knew that the Purchaser had converted them and obtained saleable securities thereby.

93.    Defendants failed to disclose to investors that NIR never realized a cent on these

transactions.  Even though no payment was ever received thereupon, Defendants never wrote down the value of these transactions, and charged the respective funds the full management and performance fee on the amount of the transactions.

94.     Not only did Defendants never return the management and performance fees "earned" on these transactions even after it became apparent that there would never be any recovery, Defendants never took any actions to either recover on these transactions or obtain a return of the debentures.  Had Defendants done so, they would have had to realize a loss on the transactions, which would have lowered the management and performance fees they obtained. At the very least, Defendants were on notice, after receiving the January 4, 2009 investigative report, that Defendants would likely suffer a loss on the transaction and should have undertaken steps to recover on the transaction or seek a return of the debentures.

95.     In an email exchange between the Purchaser and Ribotsky that predates the transactions, it becomes apparent that avoiding having to take a realized loss on the transaction was one of the undisclosed factors motivating Defendants.  As Ribotsky explained the transaction: "We sell it to you.  For marked value.  So we don't take a hit on the books."

96.     The email exchange between Ribotsky and the Purchaser predating the transaction is telling in how nakedly it reveals that a major motivation for Defendants was not the best interests of the funds they managed, but preserving their fees.

97.     As set forth by the Purchaser, NIR would sell the assets "at market no discount. Done with a note.  You manage the new funds assets at 2 and 20."

98.     When Ribotsky recognized that investors would only get a note, not actual cash, the Purchaser reminded him that since the assets were "not sold at a discount" it thus "solves your underlying redemption problem, mark to market, monthly reporting, and you keep the same

fee." This email was consistent with a prior email from the Purchaser which pointed out, notwithstanding the absence of any cash changing hands, "You can mark it on your books as a sale. That goes directly to your returns."

99.     As another email from the Purchaser noted, even though the note isn't realized it "doesn't have to be marked to market because its not a publicly traded security. Goes on your books but eliminates the aged paper off your books."

100.     Realizing how problematic this was, Ribotsky told the Purchaser "Obviously if we do this. This remains hush hush."

101.     Prior to entering the transactions with the Purchaser, there had been other significant dealings between the Purchaser and NIR, including Purchaser bribing NIR's employees who approved deals brought to NIR by the Purchaser. Between 2006 and 2008, defendant Dworkin knowingly and intentionally obtained kickbacks from PIPE deal finders, including from the Purchaser. Notwithstanding his prior knowledge of the Purchaser's bribery of his employees, Ribotsky engaged in the debenture purchase transaction described above with him.

102.     Although Ribotsky and many of NIR's personnel knew about this dishonesty of a major employee, not only was nothing done about it, it was not disclosed to investors. To the contrary: NIR represented to investors in written materials that "analysts DO NOT receive compensation to close deals with issuers."

**Ribotsky Misled Investors When Forming the Master Fund**

103.     By 2007, NIR's investment and trading strategy was not generating enough cash income (realized gains) to pay mounting investor redemption requests. Faced with a lack of cash to pay all of the outstanding investor redemption requests, Ribotsky paid the redemptions using

other investors' money.

104.    Defendants sent letters to shareholders in the AJW Offshore Fund and AJW Qualified Partners investors.  The May 9, 2007 letter to investors in the off-shore fund (the "Off-shore Letter") stated that "We are writing to inform you that we intend to reorganize AJW Offshore Ltd … [and] describe to you the effect of this conversion." The letter went on the state that "all or substantially" all of the fund assets would be transferred to AJW Master Fund, Ltd. In bold print, it promised "**Your rights will not be materially adversely affected as a result of the conversion and the Company's overall strategy and risk profile will not change**." Instead of holding assets directly, the Company would be a shareholder of the Master Fund. "The personnel making investment decisions . . . will not change."

105.    The Off-shore Letter further recommended that "the conversion is in the best interest of the Company and will also result in certain benefits to you.  Most importantly, since the Master Fund will have a larger pool of assets from which to draw, we believe that the Master Fund will be better able to take advantage of available investment opportunities and provide increased liquidity."

106.    A similar letter was sent on May 9, 2007 to investors in the on-shore fund (the "On-shore Letter").  Importantly, since the conversion required the active consent of investors in the on-shore fund, the On-shore Letter also purported to "explain the process for you to consent to the conversion."  The On-shore letter also promised, in bold, that "**Your rights will not be materially adversely affected as a result of the conversion and the Company's overall strategy and risk profile will not change**."  It further opined "the conversion is in the best interest of the Company and will also result in certain benefits to you.  Most importantly, since the Master Fund will have a larger pool of assets from which to draw, we believe that the Master

Fund will be better able to take advantage of available investment opportunities and provide increased liquidity." It thus stressed that the advantage of having a "larger pool of assets" was for the purposes of making investments.

107.    In order to effect the conversion, the On-shore Letter proposed to amend and restate the fund's Operating Agreement, which required the approval of a majority in interest, and thus included a "Member Consent Form" for members to consent or not; failure to return the form would be deemed to constitute consent.

108.    Consequently, in June 2007, Ribotsky combined an AJW off-shore fund with an AJW on-shore fund by creating a new "master/feeder" fund – the Master Fund. The AJW on-shore fund and the AJW off-shore fund were the only shareholders in the Master Fund. Pursuant to the reorganization, all or substantially all of the assets of both the on-shore and the off-shore funds were purportedly to be transferred to the Master Fund in exchange for shares in the Master Fund.

109.    As a result of the conversion, rather than own an interest in the on-shore or off-shore fund that shared in the success of the investments made by either fund, investors would instead have what was in effect a proportional interest in the Master Fund.

110.    At the time Ribotsky merged the on-shore and off-shore funds, there was $39 million in outstanding investor redemption requests in the on-shore fund that were payable in June and September 2007. However, there was only $13 million in cash in the on-shore fund to meet these pending redemption requests. During that same period, there was $124 million in cash in the off-shore fund, but only $28 million in outstanding investor redemption requests in that fund. Faced with a lack of available cash and the inability to generate sufficient cash by converting and selling out of the PIPE investments, Ribotsky decided to merge the on-shore and

36

off-shore funds so that he could use the cash in the off-shore fund to pay the outstanding redemptions in the on-shore fund.

111.    Ribotsky, however, did not disclose to investors in the on-shore and off-shore funds the real reason why he was merging the funds to create the Master Fund.  Rather, Ribotsky misleadingly told investors that the reason he was merging the funds was because a master feeder fund structure was in the best interest of the investors in both funds.

112.    The fact that there were an increasing number of redemptions was never disclosed to investors.  Defendants did not disclose to investors in the on-shore fund that, unless it merged with the off-shore fund, there was insufficient cash on hand to pay scheduled redemptions or continue operations.  Defendants never disclosed the on-shore fund's precarious financial position or that it would have run out of cash in July, 2007 but, to the contrary, misrepresented to investors that the on-shore fund was stable and prosperous.  Indeed, in the months preceding the May 9, 2007 letter, when some on-shore investors asked to redeem, Defendants recommended strongly that they not do so, vouchsafing for the strength and stability of the investments. Nor did Defendants disclose to investors in the off-shore fund that assets in their fund were going to be used to pay redemptions in the on-shore fund. Had investors known the truth, many would have chosen to redeem their investments as quickly as possible.

113.    At a minimum, in order to make his statements to investors not misleading, Ribotsky should have disclosed the fact that he was merging the two funds so that he could use the cash in the off-shore fund to pay the outstanding investor redemptions in the on-shore fund. Indeed, the major, if not sole motivation, for Defendants to adopt a master/feeder structure was to be able to handle redemptions without having to close the on-shore fund.

114.    Even after the transformation to the master/feeder structure, proper corporate

37

formalities were disregarded.  The cash and assets from each feeder fund were not upstreamed to

the master level, as Defendants represented to investors would be done.  When money was used

from one fund to pay redemptions for the other, it was simply taken directly from the feeder with

the available cash, and not from the master fund.  This failure to follow corporate formalities was

never disclosed to investors.

**Misstatements and Omissions Regarding Redemptions and the Health of the AJW Funds**

115.    During the relevant time period Defendants failed to disclose that there were an

increasing number of unsatisfied investors who had submitted redemption requests, or that the

increasing number and amount of redemption requests made the future of the AJW funds

tenuous.   These matters were well-known within NIR, and discussed internally by, among

others, Ribotsky.

116.    At some point during 2007 and 2008 as redemption requests increased and the

flow of new money into the AJW Funds slowed to a trickle most months, Defendants became

more concerned about the viability of the AJW Funds.  These concerns were not disclosed to

new investors, or to old investors who asked about the health of their investments.  Instead, when

investors sought to redeem in 2007 and 2008, Defendants vigorously campaigned to retain their

investments, vouching for the safety and future profitability of these investments.  Defendants

also told investors who asked that redemptions were a small portion of total available funds.

117.    Defendants took steps to rebuff redemption requests out of concern that there was

insufficient cash to meet the requests.  Defendants' efforts to rebuff redemption requests

involved, *inter alia*, claiming redemption requests were improper for lack of notarization,

whereby NIR required investors to resubmit a newly notarized request in the following

redemption window (which, conveniently, was 150 days hence).  The same notarization

38

requirement, curiously, did not extend to investments, only redemption requests.  Moreover, not all investors were required to submit notarized redemption requests.

118.    Early 2007 emails reflect Defendants' increasing desperation.  For example, a July 5, 2007 email from Ribotsky to NIR's CFO stated that "We are running low on cash in ajw.  May have to reallocate."

119.    This email was followed later in the day by an email to senior staff stating that "We have just redeemed 33 million today in off-shore.  5 mill in qualified and 3 mill in ajw.  We will have to redeem approximately 17 mill in qp in march and 45 mill in offshore.  So we have to either cease doing deals or have to do some of that and replacing it all."

120.    Another email chain dated April 9, 2007 between Dworkin and Ribotsky expressed the concern even more direly that redemption requests threatened the continued existence of the AJW Funds.  Dworkin wrote "It seems like we cant meet redemptions or funding requirements.  I am worried."  Ribotsky replied:  "Funding requirements?  When did we have a problem with funding requirements.  And you should be worried.  You get paid off these investors.  So you should be.  Gotta get on the ball and get the marketer working or eowing [*sic*] in the right direction".

121.    That same day, Ribotsky had an email exchange with NIR's CFO regarding another redemption request, in which Ribotsky stated that as a result of redemption requests "We will have to close up."

122.    When the CFO responded to Ribotsky saying they could "go through it all when you get back" Ribotsky replied "Nothing to go through.  It can't meet its redemptions.  Its over.  Closed.  And then the rest will falter."

123.    Notwithstanding the expression internally within NIR of serious concerns about

the inability to meet redemption requests, Defendants, not only failed to disclose these grave concerns to investors, they affirmatively misrepresented to investors the conditions of the AJW Funds.  Among other misrepresentations, in August 2007 an investor asked about whether NIR "experience[d] any redemptions" and if so, "how much is pending?"  Defendants answered in a series of mostly non-responsive emails attempting to avoid this question, but when pressed to respond to the "questions regarding redemptions" Defendants claimed that they "missed that one" but that there were "no major redemptions so far."  This was not true.

124.    Nor did Defendants disclose that there was a significant and material deterioration of the collateral underlying the portfolios of the AJW funds, including an increasing number of default events, such as the bankruptcy of portfolio companies, or the delisting of their shares.  It was thus becoming harder and harder for NIR to realize gains.

125.    Defendants told investors NIR was protected from defaults because the portfolio companies had collateral or other assets securing the loans.  In marketing meetings, Defendants claimed that there had been very few defaults, and that what defaults existed could be cured by seizing collateral.  Investors were told loans were supported by collateral, but in reality, there were few real debentures with effective collateral. During one meeting with an investor at NIR's office, Defendants claimed that all loans were secured by collateral and that NIR had never had a loss on any debenture.  Defendants also claimed that when a rare default event did occur, NIR had been able to call on collateral, including even in one instance a CEO's personal residence. But this was not the case.

126.    Either the assets serving as collateral were "soft" assets like intellectual property with little economic value, or otherwise non-marketable assets.  Even where transactions did have real assets serving as collateral, the portfolio companies often failed to memorialize NIR's

rights with the proper filings, and NIR failed to take sufficient steps to secure its right to such collateral.

127.    However, notwithstanding this reality, and investors' expressed concern about this issue, Defendants advised one investor who inquired about defaults in August 2007 that there were "No defaults due to the current market conditions.  **All** portfolio companies are moving forward."  (emphasis supplied).

128.    Personnel at NIR advised Ribotsky that he should write down or write off debentures that had been on the books for a long time and that were unlikely to lead to any realized gains.  Ribotsky refused to do so, and doing so would have required recognizing a loss and reducing Defendants' fees and compensation.

129.    Instead of writing-down the fair value of the Funds' investments in delinquent and non-performing companies, Ribotsky "restructured" the debt by issuing new debentures.  He rolled the outstanding principal, interest and default penalties into new debentures and negotiated greater conversion discounts for the issuer's shares.

130.    Although this restructuring strategy contractually entitled the Funds' to a greater quantity of shares, for most companies, there was little, if any, trading volume for the shares by 2007.  By restructuring the loans in this manner, NIR ended up recording more and more unrealized gains for the investments and avoided disclosing what otherwise would be a growing number of delinquent or defaulted loans.  The practical effect of the restructurings, however, was that NIR would never be able fully to convert the unrealized gains to realized gains because there was insufficient trading volume to sell the billions of shares the Funds were now contractually entitled to under the terms of the restructured debentures.

131.    Therefore, Ribotsky's decision to restructure the loans into new debentures made

it virtually impossible for the Funds to ever fully liquidate most of the PIPE investments through NIR's "convert and sell" trading strategy.

132.    These omissions gave a false portrait of the success of the AJW funds, and would have made it more difficult for investors to be able to have their redemptions satisfied.

## The 2008 Restructuring

133.    As set forth above, in October 2008 Defendants advised investors that redemptions would be suspended, and that a new set of funds would be formed.  Investors were advised that they had to exercise an election: remain in their existing AJW fund, or transfer their investments into the new AJW funds. The new funds, designated with a Roman numeral "II" after the name (e.g., AJW Qualified Partners II, LLC) purportedly differed in only one respect: the redemption options they offered.  Option One provided for an exchange to the new fund, with a reduced management fee and incentive fee in addition to a three year lock-up for redemption requests; Option Two, which also provided for an exchange of interests into the new fund, entailed a reduced management and incentive fee (although not as greatly reduced as in Option One), with no lock-up, but a staggered schedule allowing for redemptions of 12.5% of each investor's interest per quarter; and Option Three entailed the investor keeping his investment in the original company (with the original management and incentive fees), which would then liquidate and make periodic distributions to investors as cash flow allowed.

134.    The October 2008 restructuring of the Funds resulted in further purchases and sales by existing investors into newly-created AJW funds.  NIR sent investors private placement memoranda and other offering material for the new funds, and the investors chose to invest in the new funds by executing subscription agreements which ultimately represented their portion of ownership in the new funds.

42

135.    In connection with this late 2008 restructuring, Defendants omitted material facts about the financial condition of the AJW Funds at issue, including regarding the increasing number of redemptions, the fact that these redemptions put the future of the funds in jeopardy, as well as the other material facts referenced above.  Notwithstanding internal recognition and concern of these issues by Defendants and others, communications to investors at this juncture, including written and oral statements, conveyed an image of robust health.

136.    For example, among other misrepresentations, the October 2008 communications sent to all investors stated that "over the last 12 months, [NIR has] become more risk averse." It also claimed that "our strategy has done exactly what it was designed to do, making 2 to 4 year investments." Thus, it was asserted, NIR's "transactions are performing well and we have not seen an increase in default ratios from the current market conditions . . .  our strategy is performing very well on both an absolute and relative basis."

137.    Ribotsky made similarly false and misleading statements about the 2-4 year exit strategy to exiting investors in the period leading up to his October 2008 decision to stop paying investor redemptions and to restructure the Funds by creating a new class of AJW funds.  In a letter to investors, dated October 16, 2008, Ribotsky informed them that NIR was suspending the payment of all investor redemption requests due to adverse market conditions, and that he was creating a new class of AJW funds.  Among other things, Ribotsky stated in the letter that "it is generally expected to take approximately 36 months or longer to successfully sell the securities of the entire portfolio companies held by the [Funds]."

138.    This statement was misleading because Ribotsky knew at the time he made the statement that NIR could not liquidate the PIPE investments, either individually or in the aggregate, in approximately 36 months.  Ribotsky made this misleading statement in order to

induce the existing investors to invest in his new AJW funds, which many investors did in exchange for lower management and performance fees.

139.    Nor did Defendants disclose the other material facts referenced above in connection with investors' transfer of their investments from their prior funds to the new AJW funds.

## ALLEGATIONS RELATING TO US-BASED ACTIONS

### Defendants' Offers of Interests in the AJW Funds in the United States

140.    NIR offered interests in the AJW Funds to investors through a variety of avenues, the vast majority of which transpired in the United States.

141.    Many investors had in-person meetings with Ribotsky and other NIR personnel at NIR's office in New York prior to making their investment decision. During these meetings, Defendants made presentations that included the misrepresentations and omissions referenced above.

142.    In addition to these in-person meetings at NIR's New York office, many of these investors also had numerous phone calls within the United States with Ribotsky and other NIR personnel, and received numerous written marketing materials that were mailed from NIR's New York office, offering interests in the AJW Funds.

143.    Among the materials sent out of NIR's New York office, to both investors in the on-shore and off-shore funds, was the misleading chart referenced above at paragraphs 77 to 78 as well as other false and misleading marketing materials, plus periodic statements of net asset values and other account related information.

144.    Offers of interests in the AJW Funds were also made through the transmission of Private Placement Memoranda ("PPM's") to prospective investors.  The PPM's for the off-shore

and on-shore funds were mailed from the United States and all provided that delivery of the PPM constituted an offer of an interest in the applicable AJW Fund.  The PPM's typically recited that "THIS IS A PRIVATE PLACEMENT MADE ONLY BY DELIVERY OF A COPY OF THIS MEMORANDUM TO THE OFFEREE." These PPM's were sent to numerous investors in the United States, many of whom ultimately purchased interests in the AJW Funds.

145.    NIR and Ribotsky also offered interests in the AJW Funds through using certain US-based "finders" who introduced clients to the AJW Funds.  These finders were compensated by sharing in the incentive-based compensation Defendants charged investors for any purported upside earned by the AJW Funds, and were entitled to continue receiving such compensation for as long as the investors they introduced remained invested with Defendants.

146.    The majority of investors introduced in such fashion were introduced through finder firms based in the United States.  Defendants offered interests in the AJW Funds to them through meetings in the United States, mostly at the New York offices of NIR, through sending them written materials in the United States, and through various electronic and telephonic communications within the United States.

147.    The communications that were the heart of Defendants' offering of interests in the AJW Funds occurred in the United States.  Many of the misrepresentations and omissions alleged herein were made to these finders (in addition to investors individually).

148.    Moreover, many of the written materials were sent to the US-based finders for re-transmission to their clients, both in the United States and abroad.

149.    These finders advised their clients they introduced to Defendants to invest in the AJW Funds in reliance on these misrepresentations and omissions.

**United States-Based Transactions in the AJW Funds**

150.     As noted above, there were both on-shore and off-shore funds among the offerings of the AJW Funds. For the on-shore funds, the vast majority of the purchasers were United States-based investors, who made their purchases in the United States.

151.     Purchases in the on-shore funds were made via the execution in the United States by a United States investor of a subscription agreement for the specific fund.  The executed subscription agreement was sent to the specific fund manager, in the United States, and the investors would also either send a check to the manager of the specific fund in New York or wire funds from a United States account to a New York bank account set up by the specific fund.

152.     These procedures were often set out in detail in the offering materials for each of the various AJW Funds.  For example, with respect to purchasers of the AJW Partners, LLC Fund, an on-shore fund, the Subscription Agreement for that fund provided that to purchase securities investors were to send an executed subscription agreement to AJW Partners, LLC, in New York.  It further required investors to send funds via wire transfer to a bank in New York or by delivery of a check to the New York offices of AJW Partners.

153.     The same procedures applied with respect to AJW Partners II, LLC, another on-shore fund, where the subscription agreement provided that their securities were obtained by sending an executed subscription agreement to New York and by sending payment via wire transfer to a New York bank.

154.     The Subscription Agreement for another on-shore fund, AJW Qualified Partners, LLC, also provided for executed subscription agreements to be sent to the company in New York and for payment to be made by wire to a New York bank or by sending a check to that fund in New York.  It further suggested that investors call defendant Ribotsky directly in New York to

46

advise him of the date, amount, and bank details of purchase.  Investors purchased interests in this fund by doing as directed.  Similarly, the PPM's for AJW Qualified Partners II, LLC also directed that completed subscription agreements were to be sent to AJW Qualified Partners II, LLC in Roslyn NY, and that payments could be made via wire to a bank in Great Neck, NY.

155.    This AJW Qualified Partners II, LLC PPM further provided in the annexed Subscription Agreement that the "Subscription shall become effective when the subscription agreement … has been duly executed by the Subscriber and has been accepted and agreed to by AJW Manager, LLC, the manager of the Company."  AJW Manager was a New York limited liability company.

156.    Similar instructions were also given to investors in the off-shore funds.  For example, AJW Offshore II, Ltd., the subscription agreement provided that funds to purchase the interest were to be made to a New York bank.

157.    Even the off-shore funds had domestic purchasers which, for various tax reasons, were legally allowed to purchase interests in off-shore funds.  Many of the off-shore investors in the off-shore funds were introduced to NIR by the United States-based finders referenced above.

158.    However, even for those non-United States-based investors who invested in the off-shore funds by sending money to an off-shore account, those purchases were not final until they were accepted by NIR in New York, at which point a binding, irrevocable contract had been formed.

159.    For these purchasers, they would initially send their money to the AJW Offshore administrator in the Cayman Islands.  That administrator would then routinely email Ribotsky in New York advising the receipt of a "subscription notice" and requesting final approval of the investment by Ribotsky.  The administrator would request that NIR in New York "review and

approve by return mail."

160.    Defendants, located in New York, would then respond by email to approve the transaction, which would constitute the completion of that transaction and the irrevocable assumption of liability and passing of title in New York.  It was in the acceptance that the parties became irrevocably committed to each other, and that NIR became irrevocably bound at this point to deliver the interests in the AJW Funds.

161.    As such, these purchasers incurred and irrevocable liability to carry out the transaction within the United States, and title to these securities hereby passed within the United States.

162.    Many off-shore investors also transferred investments from one account to another, using the same procedures. The investor would submit the request to the Cayman administrator, who would then relay it to Defendants in New York who would make the ultimate determination of whether to accept the transfer.

163.    Some of these off-shore investors made their investments in the off-shore funds via the wire transfer of funds to a bank in New York.  Thus, for AJW Offshore II, Ltd., the subscription agreement provided that funds to purchase the interest were to be made to a New York bank, where the exchange of money between investors and Defendants occurred.

164.    The master fund could not have been formed without transferring and commingling all or substantially all of the assets of the on-shore fund with the assets of the AJW Off-shore Fund.

**The Management of the AJW Funds Was in the United States**

165.    The relevant acts of the Defendants relating to the management of the AJW Fund, including all operational and investment decisions for each of the AJW Funds, all took place in

48

the United States.

166.    These acts included due diligence with respect to any investments or proposed

transactions, review of materials relating to proposed and actual investments, meetings with

portfolio companies, investments in portfolio companies, meetings with actual and potential

investors, calculation of NAV for any of the funds, creation of subscription and marketing

materials, using United States lawyers and accountants, and the drafting of any reports

disseminated to investors, including any periodic reports and newsletters.

167.    The New York location for the management of the AJW Funds was described in,

*inter alia*, the PPM's for the various funds, which set forth that the managers for the funds were

located in New York.  For example, the PPM's for AJW Qualified Partners II, LLC provided that

the company and its manager were located in New York.  The same held true for the other on-

shore funds.

168.    The same was also true for the off-shore fund, and for the master fund.  For AJW

Off-shore, the investment manager was First Street Manager II, LLC, an LLC formed under the

laws of New York in 1999, with NIR (a New York entity) as its sole owner and manager.

169.    First Street Manager II, LLC, also served as the investment manager of AJW

Master Fund, Ltd (a Caymans fund).

170.     Indeed, the PPM for the off-shore fund strictly delimited the authority of any

Cayman-based entity as largely ministerial, and made clear that the fund would be managed from

New York, dictating that "The Administrator has no responsibility with respect to trading

activities of (or the monitoring thereof), the Investment Manager, the management of the Fund or

the accuracy or adequacy of this Memorandum.  The Administrator does not act as guarantor or

offeror of the shares."

171.    When investors sought to redeem investments in 2007 and 2008, Ribotsky and

other NIR personnel fervently lobbied them not to do so, telling them the funds, including the

domestic funds, were poised for growth, but did not advise them of outstanding redemption

requests or other problems.  This lobbying took place in conversations and personal meetings

taking place wholly within the United States.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (NIR and Ribotsky)

172.    Paragraphs 1 through 171 are re-alleged and incorporated by reference as if fully

set forth herein.

173.    NIR and Ribotsky, directly or indirectly, singly or in concert, in the offer or sale

of securities by the use of means or instruments of transportation or communication in interstate

commerce or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b)

obtained money or property by means of untrue statements of material fact, or omitted to state a

material fact necessary in order to make statements made, in light of the circumstances under

which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses

of business which operate or would operate as a fraud or deceit upon the purchaser.

174.    NIR's and Ribotsky's false and misleading statements and omissions were

material because, among other reasons, the misrepresented and omitted facts were important to

prospective and existing investors when making investment decisions concerning the AJW

Funds.

175.    By reason of the activities described herein, and in particular the false and

misleading statements and omissions alleged above, NIR and Ribotsky violated Section 17(a) of

the Securities Act [15 U.S.C. §§ 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (NIR and Ribotsky)

176.     Paragraphs 1 through 175 are re-alleged and incorporated by reference as if fully set forth herein.

177.     NIR and Ribotsky, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities by use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon other persons.

178.     NIR's and Ribotsky's false and misleading statements and omissions were material because, among other reasons, the misrepresented and omitted facts were important to prospective and existing investors when making investment decisions concerning the AJW Funds.

179.     By reason of the activities described herein, and in particular the false and misleading statements and omissions alleged above, NIR and Ribotsky violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (NIR and Ribotsky)

180.     Paragraphs 1 through 179 are re-alleged and incorporated by reference as if fully set forth herein.

51

181.    NIR and Ribotsky at all relevant times were acting as investment advisers to the AJW Funds within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

182.    NIR and Ribotsky, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers: (a) with scienter employed devices, schemes or artifices to defraud any client or prospective client; and/or (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

183.    As investment advisers to the AJW Funds, NIR and Ribotsky owed the AJW Funds fiduciary duties of utmost good faith, fidelity, and care to make full and fair disclosure to them of all material facts concerning the AJW Funds – including any conflicts or potential conflicts of interests – as well as the duty to act in the AJW Funds' best interests, and not to act in their own interests to the detriment of the AJW Funds.

184.    NIR and Ribotsky breached their fiduciary duties to the AJW Funds, engaged in fraudulent conduct and engaged in a scheme to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)] as set forth above, and in particular, by, *inter alia*, (1) misappropriating approximately $1 million from the AJW Qualified Fund, as described above; (2) engaging in the transaction set forth in paragraphs 79 to 102 above, and by failing to take appropriate action to mitigate the damages to the AJW Funds caused as a result thereof; (3) siphoning off assets from one of the AJW Funds to pay for redemptions on another one of the AJW Funds; (4) taking an unauthorized loan from AJW Qualified Partners through Equilibrium Equity; and (5) failing to recognize losses or write-downs by rejecting the offers of portfolio companies to redeem their debentures, and instead rolling over defaulting debentures into new ones, even though these had no realistic chances of being repaid.

185.    By reason of the activities described herein, NIR and Ribotsky violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8**
**(NIR and Ribotsky)**

186.    Paragraphs 1 through 185 are re-alleged and incorporated by reference as if fully set forth herein.

187.    NIR and Ribotsky, while acting as investment advisers to pooled investment vehicles, the AJW Funds, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce: (a) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading to any investor or prospective investor in the pooled investment vehicles; and/or (b) engaged in any acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicles.

188.    NIR's and Ribotsky's false and misleading statements and omissions alleged above were material because, among other reasons, the misrepresented and omitted facts were important to prospective and exiting investors when making investment decisions concerning the pooled investment vehicles.

189.    NIR and Ribotsky violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] by knowingly, recklessly or negligently making the material misrepresentations and omissions alleged above.

190.    By reason of the activities described herein, NIR and Ribotsky violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. §

275.206(4)-8].

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of
Section 10(b) of the Exchange Act and Rule 10b-5
(Dworkin)**

191.    Paragraphs 1 through 190 are re-alleged and incorporated by reference as if fully set forth herein.

192.    NIR and Ribotsky, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, knowingly or recklessly (a) have employed devices, schemes and artifices to defraud; (b) have made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) and/or  have engaged in acts, practices and courses of business which operate as a fraud and deceit upon investors.

193.    Dworkin knowingly provided substantial assistance to NIR and Ribotsky in the commission of these violations.

194.    By reason of the activities described, Dworkin aided and abetted NIR's and Ribotsky's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of
Section 206(4) of the Advisers Act and Rule 206(4)-8
(Dworkin)**

195.    Paragraphs 1 through 194 are re-alleged and incorporated by reference as if fully set forth herein.

196.    NIR and Ribotsky, as investment advisers, made untrue statements of material

54

facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in pooled investment vehicles; and NIR and Ribotsky otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

197.    Dworkin knowingly provided substantial assistance to NIR and Ribotsky in the commission of these violations.

198.    By reason of the activities described herein, Dworkin aided and abetted NIR's and Ribotsky's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining NIR and Ribotsky, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)] and Rules 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**II.**

Permanently enjoining Dworkin, his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating and aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**III.**

Ordering NIR and Ribotsky, on a joint and several basis, and Dworkin to disgorge any ill-gotten gains received from their violative conduct alleged in this complaint, and to pay prejudgment interest thereon.

**IV.**

Ordering NIR and Ribotsky to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]; and ordering Dworkin to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80-9(e)].

**V.**

Granting such other and further relief as the Court may deem just and proper.


Dated:  New York, NY
        August 17, 2011

_____

Andrew M. Calamari
Acting Regional Director
Howard A. Fischer
Senior Trial Counsel
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center – Suite 400
New York, New York 10281
(212) 336-0589 (Fischer)
Email: Fischerh@sec.gov


Of Counsel:
Kenneth Byrne